PEOPLE *v.* WEESE.

1. CRIMINAL LAW—BLUE SKY LAW—EVIDENCE—LICENSES.
    In a prosecution for violation of the so-called blue sky
    law (3 Comp. Laws 1915, § 11945 *et seq.*), where the
    complaint charged sales not only to the persons named
    but also to "divers other persons," and also charged that
    the stock was offered for sale in the course of continued
    and successive transactions of a similar nature, there was
    no error in not confining the testimony to sales made to
    persons named in the complaint.

2. SAME—LICENSES—DEFENSES—INTENTION.
    The defense that plaintiff had a right to sell the stock
    under the law without first obtaining a license, because
    he was the owner thereof, is not available to defendant,
    where it appears that he bought it with the intention of
    reselling.

Exceptions before judgment from Leelanau; Mayne
(Frederick W.), J.     Submitted October 11, 1923.
(Docket No. 133.)     Decided December 19, 1923.

Jasper Weese was convicted of violating the "blue
sky law." Affirmed.

*Parm C. Gilbert,* for appellant.

*Andrew B. Dougherty,* Attorney General, and *C. L.
Dayton,* Prosecuting Attorney, for the people.

MOORE, J.     The defendant was convicted of a viola-
tion of the "blue sky law," so-called. The case is
here on exceptions before sentence. The complaint
reads in part as follows:

"On the 14th day of May, A. D. 1920, and on divers
other days between that day and the 1st day of May,
A. D. 1921, at the townships of Leland and Suttons

On blue sky laws as applicable to sale by individual owner,
see notes in 15 A. L. R. 262; 24 A. L. R. 535; 27 A. L. R. 1176.

Bay, in the county and State aforesaid, one Jasper Weese late of the city of Traverse City, Michigan, was then and there a dealer within the meaning of Act No. 46 of the Public Acts of the State of Michigan for the year 1915, and did then and there offer for sale to one Noah J. Plamondon and Severn Belanger and to divers other persons to complainant unknown, the stocks of a certain company known and designated as San Antonio & Gulf Oil Company.   *   *   *   It, the said investment company not having filed in the office of the Michigan securities commission a statement showing in full detail the plan upon which it, said company, etc.,   *   *   *   he, the said Jasper Weese, offering said stocks, as aforesaid, of the San Antonio & Gulf Oil Company in the course of continued and successive transactions of a similar nature, and not being then and there the issuer of said stocks, etc.,   *   *   *   contrary to the form of the statute in such case made and provided and against the peace and dignity of the people of the State of Michigan."

The complaint was supplemented by a number of affidavits showing sales of stock by defendant. The defendant was bound over to the circuit court where an information following the complaint was filed, except that the names of more persons to whom sales had been made appeared in the information than appeared in the complaint. The defendant ·upon arraignment stood mute and the plea of not guilty was entered. Upon the close of all of the testimony the jury, by the direction of the court, returned a verdict of guilty.

Two claims are made, *first,* that the testimony should have been confined to sales made to the persons named in the complaint, and *second,* that the stock belonged to Mr. Weese, and that he had a right to sell it.

As to the first of these contentions the complaint charged sales not only to the persons named, but also to "divers other persons," and also charged that the stock was offered for sale in the course of continued and successive transactions of a similar nature. A

number of witnesses were sworn on the part of the people, who testified to different sales made by the defendant. The names of all these witnesses were indorsed upon the information. This testimony was competent as bearing upon the charge of continued and successive transactions of a similar nature. See *People* v. *Clum*, 213 Mich. at p. 656, and cases cited therein (15 A. L. R. 253).

We now come to the question of whether the sales were privileged because of the claim that defendant was the owner of the stock, and for that reason had the right to sell. The defendant was a witness in his own behalf. We quote some of his cross-examination:

"*Q.* Mr. Weese, when you obtained the stock you gave a note for it?

"*A.* Yes, sir.

"*Q.* And you had it issued in convenient denominations for sale?

"*A.* Not necessarily.

"*Q.* Well as a matter of fact you did, didn't you?

"*A.* Well, not always. I had some five hundred dollars, some thousand dollars and some hundred dollars.

"*Q.* Take it on March 27, 1920—you had two certificates of five hundred and ten certificates of one hundred and ten or eleven certificates of fifty dollars, didn't you?

"*A.* I suppose so.

"*Q.* And on April 4th you had another lot issued to you and they were issued, one five hundred, a good many hundreds, some fifties and some twenty-fives, isn't that true?

"*A.* That is the way they came, yes.

"*Q.* And so every one purchased you had split up in that fashion, didn't you?

"*A.* Yes, sir.

"*Q.* Well, then, you had them split up that way for convenience in selling, didn't you?

"*A.* Not all of it, no.

"*Q.* Most of it you expected to sell and you had it split up this way to sell, didn't you?

"*A.* No, I didn't have it split up to sell all of it.

"*Q.* Well, you expected to sell most of it, didn't you?

"*A.* I expected to keep about $10,000 worth for myself, yes.

"*Q.* Well, if you got 30% on commission on fifty thousand, you would have that much left, wouldn't you?

"*A.* No, I wouldn't.

"*Q.* Thirty per cent. of fifty thousand dollars?

"*A.* It is not all profit. You have to do a lot of traveling around and your expenses take some of this.

"*Q.* But you expected to sell part of this stock, didn't you?

"*A.* Absolutely.

"*Q.* The greater part of it, all but about ten thousand dollars, you say?

"*A.* Yes, sir.

"*Q.* And when you bought the stock in these denominations on April or March 27th, you expected to sell this stock that you bought March 27th?

"*A.* Part of it, as I said before, yes, sir.

"*Q.* And when you got the money you expected to send it down and get more stock, didn't you?

"*A.* No, oh, no. I expected to pay my notes first.

"*Q.* Pay notes first?

"*A.* Yes, sir.

"*Q.* And take thirty per cent. discount on it, didn't you?

"*A.* No, sir. I didn't take thirty per cent. discount.

"*Q.* Didn't you get a thirty per cent. discount?

"*A.* Yes, sir, they sent me that, sometimes in stock and sometimes in cash.

"*Q.* And then on the payments of the notes you got more stock?

"*A.* Yes.

"*Q.* Did you write and get more stock or did they send it to you without writing?

"*A.* They sent it as fast as I wanted it, sometimes faster than I wanted it.

"*Q.* Did you order it from them?

"*A.* Not always.

"*Q.* When they saw that your stock was getting low they supplied you with a new lot?

"*A.* Sometimes. Sometimes I ordered it."

The defendant caused to be introduced in evidence transcripts from the stock ledger of the company issuing the stock, showing that between March, 1920, and June, 1922, stock certificates were issued to upwards of two hundred persons because of sales made to them by the defendant. The record as made by the defendant shows that he bought the great bulk of the stock to sell again, and brings him clearly within the provisions of the statute.

The conviction is affirmed, and the case is remanded for further proceedings.

WIEST, C. J., and FELLOWS, MCDONALD, CLARK, BIRD, SHARPE, and STEERE, JJ., concurred.